## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 20-60** |
| v. | * | **SECTION: "H"** |
| **GARY R. GIBBS** | * | |

\* \* \*

### FACTUAL BASIS

1. The Defendant, **GARY R. GIBBS** ("**GIBBS**"), has indicated that he intends to plead guilty as charged to Count One of the Bill of Information pending against him, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.

2. The United States and **GIBBS** do hereby stipulate and agree that the allegations in the Bill of Information and the following facts are true and correct and that, should this matter have proceeded to trial, the Government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not attempt to set forth all of the facts known to the United States regarding the allegations in the Bill of Information. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **GIBBS's** guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting the Defendant's guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).



EXHIBIT 15

NDM

## I. AT ALL TIMES MATERIAL HEREIN

### A. FIRST NBC BANK

1. At all times material to the Bill of Information, First NBC Bank ("the Bank") was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit accounts.

2. The Bank was established in or about 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana. At various times, the Bank maintained branch offices in Louisiana, Mississippi, and Florida.

3. The Bank was the wholly-owned subsidiary of First NBC Bank Holding Company.

4. The Bank also had a Board of Directors ("the Board").

5. In or around May 2013, First NBC Bank Holding Company became a publicly-traded company listed on the NASDAQ.

6. On or about April 28, 2017, the Bank was closed by the Louisiana Office of Financial Institutions ("LOFI"), and the FDIC took control over the Bank.

7. Ashton J. Ryan, Jr. (referred to in the Bill of Information as "Bank President A," but "Ryan" herein) was a founder of the Bank and acted as its President, Chief Executive Officer, and Chairman of the Board from in or around May 2006 until in or around December 2016 when he stepped down as CEO and Chairman of the Board. Ryan was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's day-to-day operations. Additionally, Ryan was responsible for keeping other Board members informed of the Bank's financial condition, the adequacy of its policies and procedures, as well as its internal controls.

8. William J. Burnell (referred to in the Bill of Information as "Bank Officer B," but "Burnell" herein) was the Bank's Chief Credit Officer from in or around 2006 through April 2017. He was responsible for, among other things, the overall quality of the Bank's lending function; the Bank's credit policies and administration; the Bank's loan recovery and collection efforts; and the Bank's monitoring and managing of past due loans, including the approval of the Bank's internal list of past due loans. Burnell was responsible for compiling month-end reports, including lists of overdrawn borrowers and past-due loans. These reports should have accurately shown the quality of the Bank's assets, which included loans. Misrepresentations on these reports would have made a true assessment of the Bank's overall financial well-being impossible. Burnell was also responsible for assigning risk ratings before the Bank decided to lend to its customers. In the Bank's rating system, a "10" meant very low risk of loss to the Bank, while a "1" signified a high risk of loss to the Bank.

9. Robert B. Calloway (referred to in the Bill of Information as "Bank Officer C," but "Calloway" herein) was employed by the Bank from in or around 2006 through April 2017, serving as an executive vice president and a commercial relationship manager, with tax credit specialization.

10. As a financial institution, the Bank was subject to regulatory supervision by the FDIC and LOFI, charged with supervising and regulating the Bank to ensure that it engaged in safe and sound banking practices and complied with federal and state banking laws.

11. The Bank was also required to undergo periodic safety and soundness examinations conducted by the FDIC and LOFI. The Bank was required to report information regarding past due loans to the FDIC and LOFI regulators in advance of these examinations, which affected their conclusions regarding the Bank's financial condition.

12. In addition, the Bank hired external auditors to evaluate the accuracy of the Bank's financial statements related to, among other things, the Bank's loan portfolio and investments.

## B. GIBBS'S RELATIONSHIP WITH FIRST NBC BANK

1. The defendant, **GARY R. GIBBS** ("**GIBBS**") was a real estate developer and borrower at the Bank. He owned and operated the following entities: Coastal Phoenix Investments, LLC; DeltaCB, LLC; Delta Greenscape, LLC; GRGCB, LLC; GRGCBHS, LLC; CBBB, LLC; and numerous others. **GIBBS** presented himself as having experience in tax credits. While a customer of the Bank, **GIBBS** worked on projects in Arkansas, Louisiana, and Tennessee.

2. **GIBBS** was a customer of the Bank, both individually and through his entities. Each loan that the Bank made to **GIBBS** was guaranteed by **GIBBS**, his entities, or both.

3. Calloway was **GIBBS's** loan officer, who, along with Ryan and Burnell, participated with Calloway, both in decisions affecting the **GIBBS** loans and overall, in **GIBBS's** relationship with the Bank.

4. In connection with his Bank loan applications, **GIBBS** had an obligation to provide accurate financial statements prior to any loans, advances, renewals, or increases in loans extended to him and any of his entities.

5. When **GIBBS** submitted personal financial statements or financial information about certain of his entities to the Bank, he and others, including Ryan, Burnell, and Calloway caused these supporting documents to be placed into the Bank's records.

6. **GIBBS** obtained loans from the Bank by including false material information in his loan applications, such as inflating the value of his real estate, the value of his entities, and otherwise altering financial information regarding himself and his entities. **GIBBS** included this false information at the direction of Ryan and Calloway.

4

7. By the time the Bank closed, **GIBBS** and his entities owed the Bank over $123 million, not including loans made to nominee borrowers on **GIBBS's** behalf.

## II. THE BANK FRAUD CONSPIRACY

### A. THE CONSPIRACY:

Beginning at a time unknown to the Attorney for the United States, but at least in or around 2010, through in and around April 2017, in the Eastern District of Louisiana and elsewhere, the defendant, **GARY R. GIBBS**, and others known and unknown to the Attorney for the United States, did knowingly and willfully combine, conspire, confederate, and agree to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud First NBC Bank, a financial institution, and to obtain any of the moneys, funds, credits, and assets, owned by and under the custody or control of First NBC Bank, by means of false and fraudulent pretenses, representations, and promises relating to a material fact, in violation of Title 18, United States Code, Section 1344.

### B. THE SCHEME AND ARTIFICE TO DEFRAUD:

1. It was part of the scheme and artifice to defraud that the defendant, **GARY R. GIBBS**, along with Ryan, Burnell, and Calloway, unjustly enriched themselves by disguising the true financial status of **GIBBS**, his entities, and other borrowers; concealing the true performance of loans; and misrepresenting the nature of payments to **GIBBS** and his entities.

2. It was further part of the scheme and artifice to defraud that **GIBBS**, Ryan, Burnell, and Calloway made false statements and material omissions about **GIBBS**, his entities, and nominee loans used to hide **GIBBS's** true levels of debt. These false statements and material omissions hid the truth about (a) the purpose of the loans, (b) the borrowers' and guarantors' assets

5

and liabilities, (c) the borrowers' and guarantors' cash flow, (d) the collateral underlying the loans, and (e) the expected source of repayment.

3. It was further part of the scheme and artifice to defraud that **GIBBS**, Ryan, Burnell, and Calloway used proceeds from loans issued to Borrower E to make loan payments for **GIBBS** and his entities. Borrower E was a borrower at the Bank, but Borrower E was not listed as a guarantor on **GIBBS's** loans.

4. It was further part of the scheme and artifice to defraud that **GIBBS**, Ryan, Burnell, and Calloway used proceeds from loans issued to **GIBBS** and his entities to make loan payments for Borrower F. Borrower F was a borrower at the Bank, but **GIBBS** was not listed as a guarantor on Borrower F's loans.

*Insufficient Cash Flow and Loan Masking*

5. Ryan, Burnell, and Calloway disguised **GIBBS's** and his entities' true financial condition by, among other things, issuing new loans to make payments on **GIBBS's** existing loans and to cover his overdrafts. The new loans then appeared to be current, while the past-due amounts and overdrafts appeared to have been paid or substantially reduced. This practice ensured that loans to **GIBBS** and his entities did not appear on month-end lists of past-due or overdrawn loans, or if they did appear, the amounts that were past due or overdrawn were substantially lower than they would have been without the new loans. In reality, the new loans were designed to hide **GIBBS's** inability to pay his existing loans without additional loan proceeds from the Bank. To cover up this deceit, Ryan, Burnell, and Calloway falsely represented that **GIBBS** satisfactorily handled his loan payments and that **GIBBS** could repay his loans with money he generated from his businesses, in dozens of loan documents over several years.

6. In or around May 2011, Ryan, Burnell, and Calloway knew that **GIBBS** overdrew his accounts by hundreds of thousands of dollars and lacked sufficient revenue from his entities to

pay his overdrafts and loan payments to the Bank. Nevertheless, Ryan, Burnell, and Calloway signed loan documents authorizing a new loan of approximately $250,000 to **GIBBS**. Ryan, Burnell, and Calloway falsely stated that **GIBBS** would pay the new loans with revenue from **GIBBS's** entities. Ryan, Burnell, and Calloway omitted the material fact that the loans were made to pay **GIBBS's** existing loans and overdrafts and that **GIBBS** did not have enough revenue from his entities to make his loan payments. After this $250,000 loan was made to **GIBBS**, the loan proceeds were used to pay **GIBBS's** overdrafts and to make loan payments. Burnell provided an asset quality report to the Board that falsely omitted **GIBBS** and most of his entities from the lists of overdrawn and past-due loans. Instead, only two of **GIBBS's** entities were listed for overdrafts of less than $5,000, rather than the hundreds of thousands of dollars that **GIBBS** and his entities would have been overdrawn without the new loan.

7. In or around 2012, a similar pattern continued. Ryan and Calloway knew that **GIBBS** was still not generating enough revenue from his entities to pay his overdrafts or make his loan payments to the Bank. Nevertheless, Ryan and Calloway signed loan documents that contained false statements about **GIBBS's** ability to pay his loans with business revenue and omitted the material fact that the loans were made to keep **GIBBS** and his entities off of month-end reports about borrowers who were overdrawn or past due. For example, in or around May 2012, when overdrafts for **GIBBS** and his entities exceeded $1 million, Ryan, Burnell, and Calloway arranged a $1 million loan to **GIBBS**. In loan documents, Ryan, Burnell, and Calloway omitted the material fact that the loan was intended to keep **GIBBS** off of month-end overdraft reports. Similarly, in or around December 2012, Ryan, Burnell, and Calloway, despite knowing that **GIBBS** continued to be unable to pay his loans to the Bank with revenue from his entities, signed documents approving a loan of approximately $150,000 to **GIBBS**. The loan documents

falsely stated that the source of repayment would be cash flow from **GIBBS's** entities. Ryan, Burnell, and Calloway omitted the material fact that the loan was intended to pay **GIBBS's** overdrafts and past-due loans. As a result of that loan, **GIBBS** and his entities escaped being listed on the overdraft reports or list of past-due loans that Burnell provided to the Board for December 2012.

8. In or around June and July of 2013, a similar pattern continued. Knowing that **GIBBS** was still not generating enough revenue from his entities to pay his overdrafts or make his loan payments to the Bank, Ryan and Calloway required the Bank to lend **GIBBS** approximately $1 million per month to pay his existing loans and overdrafts. For this purpose, Ryan, Burnell, and Calloway signed documents approving a $1 million loan in June 2013 and another $1 million in July 2013 for **GIBBS**. Documents for both loans contained false statements about **GIBBS's** ability to pay his loans with business revenue and omitted the material fact that the loans were made to keep **GIBBS** and his entities off of month-end reports about borrowers who were overdrawn or past due.

*Threats of Bankruptcy*

9. On more than one occasion, **GIBBS** informed Ryan and Calloway that **GIBBS** and his entities were unable to make payments on their loans from the Bank, and that **GIBBS** was considering filing bankruptcy or not paying his loans. Ryan told **GIBBS** that the Bank could not afford for **GIBBS** to default on the loans. Ryan and Calloway continued to issue loans to **GIBBS** and his entities. Ryan and Calloway continued to make false statements and material omissions to hide from the Board, auditors, and examiners that the purpose of the loans was to keep **GIBBS** and his entities from defaulting and that, in reality, neither **GIBBS** nor his entities were able to make their payments to the Bank without receiving proceeds from new loans. Neither Ryan nor Calloway ever disclosed to the Board, auditors, or examiners that **GIBBS** was considering

defaulting on his loans or filing bankruptcy, or that Ryan told **GIBBS** that the Bank could not afford for **GIBBS** to default.

10. In or around January 2016, Calloway signed a form for the Bank's auditors regarding the loans to **GIBBS** and his entities. In that form, Calloway falsely stated that, among other things, those loans had not been restructured or modified in response to possible collection problems; that there had not been and was not pending an event of default; that the borrower did not have a history of operating losses, marginal working capital, or inadequate cash flow; and that interest was not currently being added to principal rather than paid. Those statements to the Bank's auditors were false and omitted the material information that **GIBBS** was unable to make loan payments or pay overdrafts without new loans from the Bank. Calloway also omitted the material information that because of **GIBBS's** long history of insufficient cash flow, he would have defaulted on his loans from the Bank if the new loans had not allowed him to convert his past-due interest payments into principal on new loans.

*Falsified Financial Statements*

11. **GIBBS**, Ryan, Burnell, and Calloway provided the Bank with materially false and fraudulent documents and personal financial statements, which, among other things, overstated the value of **GIBBS's** and his entities' assets, understated their liabilities, and falsified or omitted other material information.

12. In or around 2015, **GIBBS** provided Ryan with documents purporting to show that **GIBBS** had a net worth in excess of $50 million as of December 31, 2014. **GIBBS** falsely inflated the value of several of his assets, including residences, commercial real estate, and other investments. Ryan and Calloway included those documents in credit memoranda supporting loans in 2015. However, **GIBBS** also submitted different financial statements to two other banks, signed and dated on the same date as the financial statements submitted to the Bank. For one of these

other banks, **GIBBS** submitted a financial statement that included net worth amounts that were over $19 million less than the amount submitted to the Bank. For the other bank, **GIBBS** submitted a financial statement with a net worth that was over $35 million less.

13. In or around 2016, Ryan directed **GIBBS** to revise financial statements for certain of his entities for 2015, reflecting tax credit income. Following Ryan's instructions, **GIBBS** and his employees gave Ryan revised financial statements for 2015 that falsely increased the income of several of **GIBBS's** entities. The income of these **GIBBS** entities falsely increased by inflating the income associated with various tax projects, even though the entities in question had not actually earned that income. The net result of the revisions that Ryan ordered was to change several of **GIBBS's** entities from having negative income to having positive income, in some cases by a difference of over $1 million. Ryan, Burnell, and Calloway then presented those same false financial statements to the Board. Calloway also provided the falsified financial statements to the Bank's external auditors.

*False Statements about Loan Purposes*

14. In several instances, beginning in or around 2009 and continuing through in or around 2016, President A, Burnell, and Calloway authorized loans to **GIBBS** for specific commercial purposes, but Ryan, Burnell, Calloway, and **GIBBS** fraudulently diverted the proceeds of those loans to other unrelated purposes, including personal expenses.

15. On or about August 20, 2009, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $685,000 in loan proceeds to be disbursed to one of **GIBBS's** entities. **GIBBS** then used approximately $120,000 of these loan proceeds to pay expenses for his private plane.

10

16. On or about November 23, 2010, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $344,402 of new loan proceeds to be disbursed to **GIBBS**. **GIBBS** then used approximately $18,000 of those loan proceeds to pay Borrower F's loans and approximately $31,200 for a payment on **GIBBS's** house in Florida.

17. On or about May 31, 2011, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $500,000 in loan proceeds to be disbursed to **GIBBS**. **GIBBS** then used approximately $147,000 of those loan proceeds to cover other expenses, including a $6,000 house payment, $9,000 for his mother's medical care, and $72,000 for **GIBBS's** plane.

18. On or about October 31, 2011, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $500,000 in loan proceeds to be disbursed to **GIBBS**. **GIBBS** then used approximately $82,000 of those loan proceeds to pay Borrower F's loans and $47,000 for his private plane expenses.

19. On or about May 18, 2012, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $1 million in loan proceeds to be disbursed to **GIBBS**. **GIBBS** then used approximately $102,000 of those loan proceeds for his private plane expenses and $113,000 for his sport fishing boat expenses.

20. On or about August 24, 2012, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of

the loan and the source of repayment, causing $1 million in loan proceeds to be disbursed to **GIBBS**. **GIBBS** then used approximately $117,574 of those loan proceeds to pay Borrower F's loans.

21. On or about December 28, 2012, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $150,000 in loan proceeds to be disbursed to **GIBBS**. **GIBBS** then used approximately $71,776 of those loan proceeds to pay Borrower F's loans.

22. On or about February 21, 2013, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $1 million in loan proceeds to be disbursed to one of **GIBBS's** entities. **GIBBS** then used a portion of these loan proceeds to pay Borrower F's loans.

23. On or about September 13, 2013, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $1 million in loan proceeds to be disbursed to one of **GIBBS's** entities. **GIBBS** then used approximately $143,000 of those loan proceeds to pay Borrower F's loans.

24. On or about October 17, 2013, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $9.1 million in loan proceeds to be disbursed to one of **GIBBS's** entities. **GIBBS** then used approximately $86,000 of those loan proceeds to pay Borrower F's loans.

25. On or about March 21, 2016, Ryan, Burnell, and Calloway made false statements and material omissions in **GIBBS's** loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $3 million in loan proceeds to be disbursed to one of **GIBBS's** entities. **GIBBS** then used approximately $31,000 of those loan proceeds to pay Borrower F's loans.

*Nominee Lending*

26. Beginning in or around 2011, Ryan, Burnell, Calloway, and **GIBBS** concealed the true purpose of certain nominee loans. Specifically, they falsely stated in loan documents that a given loan was for one borrower's business purposes, when the true purpose of the loan was to pay another borrower's loans and overdrafts. The nominees included Borrower E, Borrower F, and their related entities.

27. Ryan, Burnell, and Calloway submitted loan documents falsely stating that Borrower E was repaying a debt to **GIBBS**. In fact, no such debt to **GIBBS** actually existed, and **GIBBS** was instead obtaining Bank funds by using Borrower E as a nominee. The loan proceeds were transferred directly to **GIBBS** or to his entities, and were, in part, used to pay **GIBBS's** and his entities' existing debts at the Bank or to enrich **GIBBS**.

28. Ryan, Burnell, and Calloway, and **GIBBS** regularly made payments on the Borrower F's loans to keep Borrower F current. They used funds from new loans that the Bank made to **GIBBS** and his entities. However, many of Borrower F's loans that **GIBBS** paid were not included in **GIBBS's** financial documents as liabilities.

29. This practice had the effect of falsely understating **GIBBS's** debt obligations in loans to **GIBBS** and his entities, making them falsely appear to have additional income available to pay new loans. It also kept the loans to the nominees from being downgraded or impaired, even

though the nominees were often unable to pay their loans without obtaining new loan proceeds through **GIBBS**.

30. All in violation of Title 18, United States Code, Section 1349.

### III. CONCLUSION

Various records, including income tax returns, IRS filing records, bank records, corporate records, audio and video recordings, and documents and tangible objects would be introduced at trial to prove the facts as set forth above. In addition, the testimony of employees and agents of the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation Office of Inspector General, the Federal Reserve Board of Governors Office of Inspector General, and other competent witnesses would be introduced at trial to prove the facts set forth above.

APPROVED AND AGREED TO:

_____  
SHARAN E. LIEBERMAN  
NICHOLAS D. MOSES  
MATTHEW R. PAYNE  
J. RYAN McLAREN  
Assistant United States Attorneys

8/25/2020  
Date

_____  
RANDY SMITH  
TIM YAZBECK  
Attorneys for Gary R. Gibbs

8-24-20  
Date

_____  
GARY R. GIBBS  
Defendant

8.24.20  
Date