UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 20-65 |
| v. | * | SECTION: "L" |
| ROBERT B. CALLOWAY | * | |

\* \* \*

## FACTUAL BASIS

1. Defendant, **ROBERT B. CALLOWAY ("CALLOWAY")**, has indicated that he intends to plead guilty as charged to Count One, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 371, of the Superseding Bill of Information pending against him.

2. The United States and **CALLOWAY** do hereby stipulate and agree that the following facts are true and correct and that, should this matter have proceeded to trial, the Government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. This Factual Basis does not attempt to set forth all of the facts known to the United States regarding the allegations in the Superseding Bill of Information. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **CALLOWAY's** guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting **CALLOWAY's** guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).



AUSA
Defendant
Defense Counsel

3. From May 2006 through April 2017, First NBC Bank was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit amounts.

4. First NBC Bank was established in 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana, and with branch offices in Louisiana, Mississippi, and Florida.

5. First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Beginning in May 2013, First NBC Bank Holding Company was a publicly-traded company listed on the NASDAQ stock exchange. On April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions ("LOFI").

6. Ashton J. Ryan, Jr. ("Ryan"), was a founder of First NBC Bank and acted as its President and Chief Executive Officer from on or about May 2006, until on or about December 2016. Ryan was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's day-to-day operations. Additionally, Ryan was responsible for keeping members of the Bank's Board of Directors ("the Board") informed of the Bank's true financial condition, the adequacy of its policies and procedures, and its internal controls.

7. From in or around 2006 through April 2017, William J. Burnell ("Burnell") was employed by First NBC Bank as its Chief Credit Officer, and was responsible for, among other things, the overall quality of the Bank's lending function; the Bank's credit policies and administration; the Bank's loan recovery and collection efforts; and the Bank's monitoring and managing of past-due loans, including the approval of the Bank's internal list of past-due loans. Burnell was responsible for compiling month-end reports, including lists of overdrawn borrowers and past-due loans. These reports should have accurately shown the quality of the Bank's assets, including loans. Misrepresentations on these reports would have frustrated attempts at making a



AUSA NDM
Defendant
Defense Counsel

true assessment of the Bank's overall financial well-being. Burnell was also responsible for assigning risk ratings before the Bank issued loans to its customers. In the Bank's risk rating system, a "10" meant very low risk of loss to the Bank, while a "1" meant a high risk of loss to the Bank.

8.   From in or around 2006 through April 2017, **CALLOWAY** was hired as a Senior Vice President of First NBC Bank. He rose to the position of Executive Vice President and served as a commercial relationship manager with tax credit specialization. From 2006 through April 2017, **CALLOWAY** received compensation from the Bank of approximately $2,368,632.00.

9.   From in or around 2009 through February 2017, Fred V. Beebe ("Beebe") was employed by First NBC Bank as a Senior Vice President and as a commercial relationship manager.

10.  As a financial institution, First NBC Bank was subject to regulatory supervision by the FDIC and LOFI, charged with supervising and regulating First NBC Bank to ensure that the Bank engaged in safe and sound banking practices and complied with federal and state banking laws.

11.  First NBC Bank was also required to submit to periodic safety and soundness examinations conducted by the FDIC and LOFI. First NBC Bank was required to report information regarding the loan portfolio and past-due loans to the FDIC and LOFI in advance of these examinations, which affected the regulators' conclusions regarding the Bank's financial condition.

12.  In addition, First NBC Bank engaged external auditors tasked with evaluating the accuracy of the Bank's financial statements related to, among other things, the Bank's loan portfolio and investments.

13.  From in or around 2008 through in or around April 2017, Gary Gibbs was a real estate developer and borrower at First NBC Bank, both individually and through his numerous

3


AUSA
Defendant
Defense Counsel

entities. **CALLOWAY** was Gibbs's loan officer. Ryan served as the approving officer on Gibbs's loans, and Burnell approved the credit risk rating. **CALLOWAY**, Ryan, and Burnell frequently discussed Gibbs's loans with each other and with other Bank employees.

14. From at least 2011, **CALLOWAY**, Ryan, and Burnell knew that Gibbs's spending was out of control and that Gibbs's entities did not generate sufficient income to make Gibbs's loan payments. Despite this knowledge, **CALLOWAY**, Ryan, and Burnell funneled loan proceeds to Gibbs by approving and facilitating loans. **CALLOWAY** and others often used loan proceeds to pay Gibbs's overdrafts and existing debt service, which artificially kept Gibbs off month-end reports that Ryan and Burnell approved and submitted to the Board. As **CALLOWAY**, Ryan, and Burnell knew, Gibbs could not afford to make his loan payments without loan proceeds. In an effort to avoid or minimize Gibbs's appearances on the overdraft and past-due reports, **CALLOWAY**, Ryan, and Burnell made misrepresentations and material omissions regarding Gibbs's creditworthiness and financial status. These misrepresentations and omissions also allowed **CALLOWAY**, Ryan, and Burnell to avoid writing off Gibbs's loans and to evade inquiries by the Board, auditors, and examiners.

15. For example, **CALLOWAY**, Ryan, and Burnell signed dozens of loan documents over several years that assigned a false and inaccurate credit risk rating to Gibbs and his entities. In many of these loans, Gibbs and his entities were assigned a credit risk rating of "5," when, in truth and in fact, **CALLOWAY**, Ryan, and Burnell knew they should have been rated "3" or lower. **CALLOWAY**, Ryan, and Burnell knew that, by assigning a false and inaccurate credit risk rating on Gibbs's loans, they were misleading the Board, auditors, and examiners about Gibbs's creditworthiness and true financial status.

16. Additionally, **CALLOWAY**, Ryan, and Burnell signed loan documents that falsely represented that Gibbs satisfactorily handled his loan payments and that Gibbs would repay his loans with money he generated from his businesses. As Gibbs's debt at the Bank grew to over

$100 million with no signs of slowing down, **CALLOWAY**, Ryan, and Burnell continued to misrepresent the manner in which the proceeds from Gibbs's loans would be spent and the manner in which the loans would be repaid. Often, **CALLOWAY**, Ryan, and Burnell omitted the material fact that they were using loan proceeds to pay previous loans that Gibbs was not otherwise able to pay, while instead stating in loan documents only that the loans were for "working capital" and that they were "performing as agreed".

17. Ryan, Burnell, and **CALLOWAY** also used Ryan's incremental authority to loan money to Gibbs, thereby keeping Gibbs off the month-end overdraft and past-due reports and concealing the true nature of the Gibbs relationship from the Board. For example, on or about May 21, 2012, **CALLOWAY** emailed Ryan and informed him that Gibbs "continues to write checks and spend non-stop." **CALLOWAY** suggested to Ryan that, in case a new market tax credit deal did not close by end of the month, Ryan should approve a $1 million incremental loan request to ensure that Gibbs's overdrafts were covered before the end of the month.

18. On or about December 28, 2012, Ryan, Burnell, and **CALLOWAY** approved a credit memorandum for a $150,000 loan to Gibbs and Coastal Phoenix. The memorandum stated that the loan would be for "working capital" and the source of repayment was "cash flows from Gary Gibbs and related companies from development activities." The memorandum did not disclose that the loan was intended to meet Gibbs's year end payments on his First NBC loans, and that the loan would also be used to pay other loans. It also failed to disclose that Ryan, Burnell, and **CALLOWAY** knew that Gibbs was not generating sufficient cash flows toward his own operations and debt service. As a result of this loan, Gibbs was kept off the past due and overdraft reports at the end of the month. Because of these false statements and omissions, approximately $150,000 in loan proceeds were disbursed, and a portion of those proceeds were used to pay another borrower's loans.

19. On or about January 15, 2016, **CALLOWAY** placed a false and fraudulent Loan



AUSA NDM
Defendant
Defense Counsel

Review document about Gibbs into the books and records of the Bank, which was also transmitted to outside auditors. The Loan Review document made misrepresentations and material omissions about Gibbs's loans, and it did not disclose that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank.

20. On or about March 18, 2016, Ryan, Burnell, and **CALLOWAY** placed a false and fraudulent Criticized Asset Action Plan ("CAAP") pertaining to Gibbs in the books and records of the Bank. **CALLOWAY** wrote in the CAAP that Gibbs's had no collateral shortfall, that all of his loans were "performing as agreed," and that Gibbs's status was "stable." These statements were misleading because **CALLOWAY** omitted the material fact that Gibbs was only able to make payments on his existing loans by obtaining new loans from the Bank.

21. On or about March 21, 2016, Ryan, Burnell, and **CALLOWAY** made false statements and material omissions in Gibbs's loan documents related to the purpose of the loan, the source of repayment, Gibbs's creditworthiness, the risk of loss to the Bank caused by Gibbs's loans, the defendants' practice of using proceeds from Gibbs's loans to make payments on loans for another borrower, and the defendants' practice of using proceeds from other borrowers' loans to make payments on Gibbs's loans. This caused approximately $3 million in loan proceeds to be disbursed to Gibbs, and a portion of those proceeds were used to pay another borrower's loans.

22. By the end of 2016, **CALLOWAY**, Ryan, and Burnell's practice of funneling money to Gibbs led to Gibbs's borrowing relationship becoming one of the largest in the Bank's loan portfolio. Despite the numerous risks associated with Gibbs's loans and the substantial threat Gibbs's borrowing relationship posed to the Bank, **CALLOWAY**, Ryan, and Burnell continued to approve and facilitate Gibbs's loans, and they concealed the truth regarding Gibbs's inability to pay his loans.

AUSA _NDM_
Defendant
Defense Counsel

23. Records, documents, and other tangible objects, along with the testimony of competent witnesses, would be introduced at trial to prove the facts set forth above.

**APPROVED AND AGREED TO:**

_____
MATTHEW R. PAYNE
NICHOLAS D. MOSES
J. RYAN McLAREN
RACHAL CASSAGNE
Assistant United States Attorneys

_8/2/22_____
Date


_____
DANE BALL
JOHN KINCHEN
RICK HOUGHTON
LAND MURPHY
Attorneys for Robert B. Calloway

_8/2/22_____
Date


_____
ROBERT B. CALLOWAY
Defendant

_8/2/22_____
Date